[Cite as *State v. Searfoss*, 2019-Ohio-4619.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

| | |
|---|---|
| State of Ohio | Court of Appeals Nos. WD-18-005 |
| | WD-18-007 |
| Appellee/Cross-Appellant | WD-18-008 |
| v. | Trial Court No. 2017CR0235 |
| Robert E. Searfoss, III | **DECISION AND JUDGMENT** |
| Appellant/Cross-Appellee | Decided: November 8, 2019 |

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, David T. Harold
and James A. Hoppenjans, Assistant Prosecuting Attorneys, for appellee/cross-
appellant.

Philip S. Kushner, for appellant/cross-appellee.

* * * * *

**ZMUDA, J.**

## I. Introduction

{¶ 1} Appellant/cross-appellee, Robert Searfoss, appeals the judgment of the
Wood County Court of Common Pleas, sentencing him to 20 years in prison after a jury
found him guilty of aggravated theft, money laundering, engaging in a pattern of corrupt
activity, grand theft, theft, and aggravated theft.

## A. Facts and Procedural Background

{¶ 2} On May 18, 2017, a 14-count indictment was issued by the Wood County Grand Jury, charging appellant with one count of aggravated theft in violation of R.C. 2913.02(A)(2) and (B)(2), a felony of the third degree, two counts of money laundering in violation of R.C. 1315.55(A)(3) and 1315.99(C), felonies of the third degree, three counts of engaging in a pattern of corrupt activity in violation of R.C. 2923.32(A)(3) and (B)(1), felonies of the first degree, two counts of money laundering in violation of R.C. 1315.55(A)(2) and 1315.99(C), felonies of the third degree, one count of grand theft in violation of R.C. 2913.02(A)(2) and (B)(2), a felony of the fourth degree, three counts of theft in violation of R.C. 2913.02(A)(2) and (B)(2), felonies of the fifth degree, one count of aggravated theft in violation of R.C. 2913.02(A)(3) and (B)(2), a felony of the third degree, and one count of engaging in a pattern of corrupt activity in violation of R.C. 2923.32(A)(1) and (B)(1), a felony of the first degree. According to the indictment, the conduct that formed the basis for these charges related to appellant's involvement with Eric Walker and the Alice C. Walker Revocable Trust as Amended and Restated on May 14, 1999 ("the Trust") over a two-year period from April 2015 through April 2017.

{¶ 3} Appellant appeared before the trial court for arraignment on May 23, 2017, at which time he entered a plea of not guilty. Counsel was appointed for appellant and the matter proceeded through pretrial discovery and motion practice. On November 1, 2017, the state filed a motion in limine, in which it sought a ruling from the trial court that would prohibit appellant from introducing evidence relating to a beneficiary consent

2.

form in which Eric purportedly consented to appellant taking loans from the Trust. Additionally, the state sought to exclude from evidence the promissory notes that related to the beneficiary consent form, along with "any and all other documents that arise from [the beneficiary consent form]." In support of its motion, the state argued that the beneficiary consent form and surrounding documents were inadmissible under Evid.R. 402 because they permitted appellant to engage in unlawful conduct under Ohio's Trust Code, R.C. Chapters 5801 to 5811, and were therefore in violation of public policy and "legally void."

{¶ 4} In his response to the state's motion in limine, appellant argued that the beneficiary consent form and related documents constituted admissible evidence that was relevant to the question of whether he acted with the requisite criminal intent to support the state's theft charges. Appellant asserted that the state's reliance on the public policy doctrine was misplaced here, because he was not seeking to have the documents admitted for purposes of enforcing the documents in a *civil* case, but was instead seeking to present the documents in a *criminal* case in order to rebut the state's charge that he removed Trust funds without Eric's consent.

{¶ 5} On November 17, 2017, the state filed its reply in support of its motion in limine, along with a request for jury instructions. In its request for jury instructions, the state sought to include references to certain statutory provisions contained within the Trust Code, arguing that the jury "needs to know the same law that the Defendant

3.

researched six months before he transferred approximately $435,000 from the Trust and converted it to his personal use."

{¶ 6} Six days later, the trial court issued its decision on the state's motion in limine and request for jury instructions. In its decision, the trial court found that the state's requested jury instructions would be relevant in a civil case against a trustee, but were irrelevant in a case involving criminal charges of theft, money laundering, and engaging in a pattern of corrupt activity. Moreover, the trial court found that the beneficiary consent form and its related documents formed an "integral part of the narrative here," and concluded that the exclusion of those documents would be inappropriate. Consequently, the trial court denied the state's motion in limine as well as the state's requested jury instructions.

{¶ 7} A three-day jury trial commenced on November 27, 2017. At trial, the state called several witnesses. Appellant took the stand in his own defense, but called no other witnesses.

{¶ 8} For its first witness, the state called Eric Walker. Eric is the grandson of Alice Walker, the settlor of the Trust, and is also the beneficiary under the Trust. Eric testified that Sun Trust in Orlando, Florida, had been the trustee of the Trust for as long as he could remember. During the time that Sun Trust was the trustee, Eric made monthly withdrawals from the Trust of approximately $5,000 in order to provide for his ordinary living expenses.

4.

{¶ 9} At some point in 2013, Eric hired appellant, an Ohio attorney, to represent him in a divorce proceeding in Wood County. Eric was referred to appellant by another attorney, Jim Hammer, who could not represent Eric due to a medical condition.

{¶ 10} During the divorce, appellant asked Eric if he had ever considered moving the Trust from Florida to Ohio. Eric expressed an interest in moving the Trust, and the conversation evolved into a discussion about investment strategies. Ultimately, appellant recommended that Eric invest the Trust assets in rental properties. When Eric agreed to move the Trust to Ohio, appellant suggested that his business, Searfoss Law, LLC, become the new trustee. Appellant also informed Eric that he could no longer act as Eric's attorney as a result of this new arrangement. Consequently, appellant advised Eric to seek independent legal counsel and sent a letter to that effect to Eric on October 16, 2014. Eric testified at trial that he did not recall ever receiving the letter, although his signature and initials appear at the end of the copy of the letter admitted into the record by appellant as Defendant's Exhibit J. Eric eventually retained Jim Hammer as his attorney once again.

{¶ 11} On February 26, 2015, Searfoss Law, LLC was appointed successor trustee. On March 31, 2015, appellant met with Eric and his wife, Jodie, in order to provide Eric with a check for $40,000 that Eric had requested in order to pay for taxes, Jodie's medical bills, and vehicle repairs. According to Eric, appellant arrived at the meeting with the check and a two-page promissory note, which appellant asked Eric to sign. Appellant explained to Eric that the promissory note was necessary because the

5.

$40,000 was "supposed to be like a loan.  But, then [appellant] said, 'If you couldn't pay it back, the trust would write it off.'"  Eric complied with appellant's request, and signed the promissory note.  At trial, the state introduced a copy of the $40,000 promissory note that did not include Eric's signature.  The copy of the note was admitted into the record as State's Exhibit 4.

{¶ 12} After presenting a copy of the $40,000 promissory note, the state introduced another two-page promissory note, also dated March 31, 2015, which was admitted into the record as State's Exhibit 5.  This promissory note evidenced a $400,000 loan that was issued by the Trust to Searfoss Law, LLC, at an annual interest rate of 2 percent.  For his part, appellant introduced the original of the $400,000 promissory note as Defendant's Exhibit W.  The original note introduced by appellant consisted of one sheet of paper with print on both sides.  Upon the state's questioning, Eric testified that he had never seen the $400,000 promissory note despite the fact that his signature appears on the document alongside appellant's signature, which appellant provided in his capacity as president of Searfoss Law, LLC.  Notably, the signature page is identical to the second page of the promissory note in Exhibit 4.

{¶ 13} Although his signature appeared on the note, Eric insisted that he never signed a two-sided document at the March 31, 2015 meeting with appellant.  Moreover, Eric testified that appellant made no mention of the $400,000 loan at their meeting, and added that appellant failed to inform him of appellant's intention to use the loan proceeds to purchase a home in Perrysburg, Ohio.

6.

{¶ 14} Over time, Eric became concerned about appellant's handling of the Trust funds. Eric stated that this concern was precipitated by appellant's failure to provide a K-1 form for Eric to complete his income taxes. According to Eric, Sun Trust historically provided him with routine statements evidencing the status of the Trust funds. No such correspondence was forthcoming from appellant. As a result of his concern about the Trust assets, Eric began to contact appellant on a weekly basis. Eric testified that appellant failed to respond to most of his efforts to communicate. When appellant did respond, meetings were scheduled and usually canceled by appellant.

{¶ 15} Finally, on April 11, 2017, Eric was able to meet with appellant to discuss the status of the Trust funds. At the meeting, appellant provided Eric with a balance sheet for the Trust, which identified the $400,000 loan as well as another $25,000 loan given to Searfoss Law, LLC on June 16, 2015. The promissory note pertaining to the $25,000 loan, which was admitted into the record as State's Exhibit 9, was signed by appellant as president of Searfoss Law, LLC, but did not include a signature from Eric. According to Eric, he began to question appellant about the $400,000 loan and whether it was supported by any collateral. Appellant responded that the loan was a business loan and no collateral was provided. Appellant then informed Eric that he was in a hurry and asked Eric to sign the balance sheet to indicate that he had received it. Eric testified that he signed the balance sheet without reading it in its entirety. Specifically, Eric stated that he did not read the following provision, which preceded his signature on the balance sheet:

7.

I, Eric Walker, acknowledge receiving a copy of this statement, all underlying documentation, approve and ratify all actions taken by Searfoss Law, LLC, Trustee to date, binding myself, my lineal descendants and the Alice Walker Trust to these actions.

{¶ 16} Following Eric's testimony, the state called Hammer as its second witness. Hammer testified that he was hired by Eric following his divorce in order to assist with the appointment of a successor trustee and to have the Trust funds relocated. In Eric's discussions with Hammer, he informed Hammer that he was seeking to have appellant appointed as trustee of the Trust. According to Hammer, Eric's reasoning for wanting to have appellant appointed trustee related to his desire to invest in rental properties, which Sun Trust was unwilling to do.

{¶ 17} On the issue of appellant, through Searfoss Law, LLC, borrowing funds from the Trust while also acting as successor trustee, Hammer indicated that he had no knowledge of such dealings. Hammer added that, had he known of such attempts to borrow over $400,000 in funds from the Trust, he would have demanded to know what the funds were being used for, and taken steps to ensure that the loans were secured. Hammer testified that the "very low" interest rate and long term of the $400,000 loan would have piqued his concern.

{¶ 18} As part of its direct examination of Hammer, the state asked Hammer whether he was required to complete continuing education on the topic of legal ethics in order to maintain his license as a practicing attorney. When Hammer responded in the

8.

affirmative, the state proceeded, without objection from appellant, to read Prof.Cond.R. 4.2, which prohibits a lawyer from communicating with a person who is represented by counsel. After reading the rule, the state asked Hammer if appellant had ever sought his consent to speak directly with Eric. Hammer stated that he did not recall appellant having sought his consent, and stated that he never granted appellant consent. On cross examination, Hammer agreed that appellant was not acting as Eric's lawyer once Eric's divorce proceeding was concluded. Hammer further agreed that the communication restriction under Prof.Cond.R. 4.2. was limited to those who are functioning as attorneys. The state then followed up on its line of questioning concerning Prof.Cond.R. 4.2 on redirect, and asked Hammer whether the Rules of Professional Conduct apply to licensed attorneys at all times, "whether * * * acting as an attorney or shoplifting from Kroger's," to which Hammer replied in the affirmative over appellant's objection.

{¶ 19} Jodie was called as the state's third witness. Jodie testified that she was present at the March 31, 2015 meeting at which appellant provided Eric with the $40,000 check and presented a promissory note to Eric for signature. According to Jodie, she was "100 percent" sure that the promissory note that was presented to Eric consisted of two pages. Indeed, Jodie stated that the document had to be two pages because Eric handed her the first page after he reviewed it, and she reviewed the first page while Eric signed the second page. Jodie identified State's Exhibit 4 as the promissory note that was presented at the March 31, 2015 meeting. Appellant did not provide Eric with a copy of the promissory note at the meeting.

9.

{¶ 20} As its fourth witness, the state called Kam Warner, the licensed real estate agent that listed the Perrysburg home purchased by appellant utilizing the funds he received from the $400,000 loan from the Trust. At the outset of her testimony, Warner authenticated a chain of email communications between appellant and herself. In an email from appellant dated March 26, 2015, five days prior to meeting with Eric and borrowing $400,000 from the Trust, appellant submitted his initial cash offer to purchase the Perrysburg home for $250,000. Following negotiations, appellant agreed to purchase the home for $255,000 and furnished a proof of sufficient funds to Warner on April 2, 2015.

{¶ 21} According to Warner, appellant's offer to purchase the home, which included a request for the sellers to include certain items of personal property, led her to believe that appellant was not interested in using the Perrysburg home as rental property. Rather, in Warner's experience a buyer who requests personal property from the seller is doing so because the buyer wishes to personally reside in the home. Warner went on to state that appellant made no mention of Eric or the Trust during the negotiations, and she noted that appellant titled the home in his personal name at closing.

{¶ 22} Following Warner's testimony, the state called appellant's wife, Katharine Searfoss, for its fifth witness. Katharine testified that appellant titled the Perrysburg home solely in his name at the time of purchase, but transferred ownership to her one month later. Katharine asked appellant why such a transfer was necessary and appellant

10.

explained that he was concerned about the cost of home insurance with the home titled in his name because he had previously filed a fire claim in 2011.

{¶ 23} During the fall of 2015, Katharine and appellant began to experience "financial difficulties." According to Katharine, appellant suggested that they alleviate some of their financial issues by selling the Perrysburg home to Katharine's parents. Ultimately, Katharine's parents agreed to purchase the home for approximately $250,000. The proceeds from the sale were deposited into appellant's bank account. Katharine testified that those funds were used to pay off family debts, and she indicated that the funds were expended in "roughly a year or so."

{¶ 24} Katharine's mother, Jan Murphy, was the state's sixth witness. Jan testified that appellant and Katharine experienced periodic financial difficulties early on in their marriage, prompting her and her husband to provide financial assistance from time to time. Jan stated that appellant's financial difficulties appeared to improve over time, and appellant was eventually able to purchase the Perrysburg home.

{¶ 25} Concerning the Perrysburg home, Jan stated that appellant purchased the home to use it as his family residence. In late 2015 or early 2016, appellant contacted Jan and her husband to ask them to purchase the home from him so that he could use the proceeds from the sale to pay for legal fees stemming from disciplinary proceedings. Jan understood at the time that appellant was facing a possible suspension of his license to practice law. After agreeing to help appellant and his family, Jan and her husband secured financing and purchased the Perrysburg home.

11.

{¶ 26} As its seventh witness, the state called Jeffrey Wapplehorst. Wapplehorst is a cybercrime special agent with the Ohio Bureau of Criminal Investigations. In his capacity as a cybercrime special agent, Wapplehorst was involved in the execution of a search warrant at the Perrysburg residence on the morning of May 11, 2017. Wapplehorst was charged with seizing any digital evidence from the residence that pertained to this case. Wapplehorst seized several electronic devices including a Lenovo ThinkPad computer, two flash drives, and a cellular telephone. After these devices were seized, a second search warrant was requested in order to allow the data on the devices to be analyzed. The second search warrant was eventually granted, thereby permitting Wapplehorst to analyze the data and extract relevant documents from the electronic devices.

{¶ 27} While analyzing the data on the electronic devices seized from the Perrysburg residence, Wapplehorst located the $400,000 promissory note, stored as both a Microsoft Word file and as a PDF file. Upon further analysis, Wapplehorst discovered that the file was last modified on March 5, 2015, while the $40,000 promissory note was created on March 26, 2015, and last modified on March 30, 2015.

{¶ 28} The state's eighth and final witness was Douglas Kinder. Kinder is a former Perrysburg police officer who is currently employed by the Wood County Prosecutor as an investigator. Kinder met with Eric in April 2017. Following the meeting, Kinder decided to launch an investigation into the information Eric shared with him at the meeting.

12.

{¶ 29} During the investigation, Kinder obtained a number of documents pursuant to grand jury subpoenas, including a beneficiary consent form that was signed on March 5, 2015 by appellant as sole member of Searfoss Law, LLC, Trustee, and Eric as sole permissible income beneficiary of the Trust. Under the terms of this document, Eric consented to Searfoss Law, LLC

> causing the [Trust] to do business with itself and Robert E Searfoss, III,
> sole owner of Trustee, ("Rob"), even though such arrangements will be
> beneficial to Trustee and Rob, and will create rights and obligations that
> may continue beyond the death of [Eric] and that may actually be, or could
> be, contrary to law * * *. [Eric] understands he should consult an attorney
> independent of Trustee or Rob and has had more than two weeks to reflect
> before signing.

{¶ 30} Later in the beneficiary consent form, there is a provision that specifies the manner in which the Trust assets would be administered by Searfoss Law, LLC going forward, as follows:

> Trustee will liquidate all assets of the [Trust] for the purposes of
> buying rental property in the Wood County, Ohio, area, and making
> payment(s) to itself or any third party, including but not limited to Rob, in
> exchange for promissory note(s) obligating the repayment of principal plus
> interest over periods of time up to forty years. Searfoss Law, LLC, will
> repay such amounts at an annual interest rate of two percent until fully

13.

repaid, in equal annual payments due on the first of January each year after payment is made to it for each such payment and related promissory note until repaid in full. * * * During any period of time in which any balance is outstanding on any promissory note owed by Searfoss Law, LLC, to the [Trust], Searfoss Law, LLC, will not charge or collect any compensation for its services as Trustee; Searfoss Law, LLC, Trustee, however, will exercise all of its powers including but not limited to paying Rob for management services provided in the operation of rental properties, but in no circumstance will Rob be engaged in his capacity as an attorney at law nor will he be paid as such.

{¶ 31} During his testimony, Kinder stated that more than one version of the $400,000 promissory note was recovered from the Perrysburg residence. Kinder then examined State's Exhibits 6, 7, and 8, and explained how these versions differed from one another and from State's Exhibit 5, the $400,000 promissory note that contained signatures from appellant and Eric.

{¶ 32} Kinder started by noting that the first page of Exhibit 6 is identical to the first page of Exhibit 5. In both notes, dated March 31, 2015, the maker is listed as Searfoss Law, LLC, and the payee is identified as Searfoss Law, LLC, Trustee of the Alice C Walker Trust. Kinder explained that Exhibit 6 does not include a signature page, but contains an amortization schedule for the $400,000 loan, broken down into 40 annual payments of $14,550.63 at an annual interest rate of 2 percent, compounded annually. By

14.

contrast, Exhibit 7 and Exhibit 8, dated April 2, 2015, identify the maker as Robert E Searfoss III, and the payee as Searfoss Law, LLC. These notes differ from Exhibits 5 and 6 in their repayment terms. Unlike the annual payments and 2 percent annual interest set forth in Exhibit 5 and Exhibit 6, the loan terms in Exhibit 7 and Exhibit 8 require monthly payments and include annual interest of 2 1/2 percent. Exhibit 7 includes a signature page bearing only appellant's signature, with no amortization schedule. Exhibit 8 contains no signature page, but does include an amortization schedule.

{¶ 33} Following his comparison of the foregoing exhibits, Kinder moved on to discuss State's Exhibit 9 and State's Exhibit 10. Kinder described State's Exhibit 9 as a "promissory note in the amount of $25,000 dated June 16, 2015, and this is a loan from the trust to Searfoss Law, LLC in the amount of $25,000." Kinder noted that the $25,000 loan included a signature from appellant, but did not include a signature from Eric. A photocopy of a $25,000 check bearing appellant's signature was attached to State's Exhibit 9. Relatedly, State's Exhibit 10 contained a promissory note also dated June 16, 2015, evidencing a $22,000 loan from Searfoss Law, LLC to appellant in his personal capacity. Only appellant's signature appears on the note.

{¶ 34} As Kinder's testimony continued, the state asked him to authenticate several additional exhibits containing evidence that was obtained from the Perrysburg residence or procured by the state via subpoena. Thereafter, Kinder testified that he had reviewed all of these exhibits. Kinder also explained that he created a summary of the evidence in the form of a Microsoft PowerPoint presentation in order to "make it easier to

15.

follow." According to Kinder, he prepared the presentation using "the evidence that was seized, through my interviews with different witnesses throughout this case, through information that I received via subpoena." Thereafter, the state displayed the PowerPoint presentation, which contains a summary of the case and sets forth the state's evidence in chronological order. Kinder began to reference the presentation as he responded to the state's questions. Appellant objected, and the following colloquy took place at sidebar:

> [DEFENSE COUNSEL]: I think this is being presented as a summary. We were never provided any copies of these summaries that he is now trying to introduce. I would object since under the rules, I think he had to provide us with notice prior to the trial.
>
> [THE STATE]: Your Honor, it is a demonstrative exhibit. There is no obligation to disclose demonstrative exhibits. We are not going to move it into evidence.
>
> THE COURT: I'm looking at Rule of Evidence 1006, Summaries. It says, "The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at a reasonable time and place. The Court may order that they be produced in court." It does not indicate it must be provided prior to trial.

[THE STATE]: And I would note, Your Honor, all of the foundational documents were provided. We also laid that foundation before we began the presentation.

{¶ 35} Following the foregoing colloquy, the state resumed its questioning of Kinder, who was permitted by the court to continue referencing the PowerPoint presentation. Kinder then proceeded to testify as to his summary of the case, prompting appellant to renew his objection. The following sidebar ensued:

[DEFENSE COUNSEL]: Judge, he indicated – I thought these were summaries, that is not a summary. This is a written outline of his testimony and I would object to that. He has got his arguments. It's like watching [the state] in closing argument.

THE COURT: It might be better than [the state] in closing argument.

[DEFENSE COUNSEL]: I would stipulate to that. But, I do think it is unfair. He is basically showing – I don't have a problem with his testifying – I have a problem when it is in writing being used in arguments.

[THE STATE]: Your Honor, there are two means of communications, verbal and visual. There is no rule of evidence which I'm aware that prohibits visual communication with a jury during a trial.

THE COURT: It would not be any different than if he testified about these things and [the state] wrote them on the board or on a transparency or something like that to emphasize it with the jury, or in closing, but –

[DEFENSE COUNSEL]: In closing I don't have a problem with.

THE COURT: - any demonstrative exhibit that may assist the jury in understanding is permitted in this form. You can obviously cross-examine him on the basis of his bullet points in summarizing his investigation, but I think it's permissible and he may do it.

{¶ 36} After the trial court overruled appellant's objection, the state moved into a line of questioning regarding the promissory notes that were recovered from the Perrysburg residence. Initially, the state asked Kinder whether the unsigned copy of the $40,000 note contained in State's Exhibit 4 was "consistent or inconsistent to what [Eric] testified to here in court." Kinder responded that State's Exhibit 4 was consistent with Eric's testimony. Asked whether Eric recognized the signed $400,000 note when it was shown to him during Kinder's meeting with Eric, Kinder indicated that Eric "was adamant that he had never seen it or signed that note." Kinder went on to testify that Eric's statement at the meeting was consistent with the testimony Eric provided earlier in the trial.

{¶ 37} As Kinder continued to testify, he recounted appellant's withdrawals from the Trust, and explained how the withdrawn Trust funds were used by appellant. We have prepared the following chart in order to summarize Kinder's testimony concerning appellant's transactions.

18.

| Summary of Appellant's Transactions | |
|---|---|
| April 2, 2015 | Appellant transfers $400,000 from the Trust and executes a promissory note reflecting the transfer |
| April 2, 2015 | Appellant makes $1,000 deposit to Wells Bowen toward purchase of Perrysburg residence |
| April 2, 2015 | Appellant deposits $3,500 into his Union business account |
| April 3, 2015 | Appellant makes payments of $6018.86, $2801.67, $1,693.12, $1,186.88, $4,150, and $1,008 |
| April 6, 2015 | Appellant pays $24,504.70 to acquire his father's 2013 Chevrolet van |
| April 6, 2015 | Appellant pays the outstanding balance ($8,843.91) on his auto loan for his 2013 Dodge Dart automobile |
| April 7, 2015 | Appellant writes $4,000 check to his father |
| April 10, 2015 | Appellant obtains a cashier's check in the amount of $245,029.75 in order to purchase Perrysburg residence |
| April 10, 2015 | Appellant opens a new bank account with $1,000 |
| April 10, 2015 | Appellant makes a $59,406.86 payment on his home equity line of credit |
| May 15, 2015 | Appellant opens a new bank account with $1,319.10 |
| June 10, 2015 | Appellant makes a $16,000 payment on his home equity line of credit |
| June 15, 2015 | Appellant transfers $1,219 from his joint account to his business account |
| June 16, 2015 | Appellant transfers $1,391.57 from his joint account to his business account |
| June 16, 2015 | Appellant transfers $25,000 from the Trust and executes a promissory note reflecting the transfer |
| January 19, 2016 | Appellant transfers $3,000 from the Trust without a promissory note reflecting the transfer |
| January 19, 2016 | Appellant sells Perrysburg residence to in-laws for $251,000 |
| February 5, 2016 | Appellant makes a $60,000 payment on his home equity line of credit |
| February 23, 2016 | Appellant deposits $18,825.45 back into the Trust |

| June 27, 2016 | Appellant transfers $3,000 from the Trust without a promissory note reflecting the transfer |
|---|---|
| November 21, 2016 | Appellant sells 2013 Chevrolet van back to his father for $21,850 |
| December 19, 2016 | Appellant deposits $2,500 back into the Trust |
| January 18, 2017 | Appellant deposits $12,956.32 back into the Trust |
| April 11, 2017 | Appellant transfers $4,000 from the Trust without a promissory note reflecting the transfer |

**{¶ 38}** As he testified, Kinder explained appellant transferred $400,000 from the Trust account at Union Bank on August 2, 2015, into another Union Bank account that was held jointly by appellant and Katharine. That same day, appellant wrote a $1,000 check from the joint account, which he used as earnest money to support his offer to purchase the Perrysburg residence. Appellant also transferred $3,500 into his business account.

**{¶ 39}** In addition to the foregoing expenditures, appellant paid off a number of debts with the proceeds from the $400,000 loan. These payments were made to Citizens Bank mortgage ($6,018.86), Bowling Green State University ($2,801.67), the City of Bowling Green ($1,693.12 and $1,186.88), and Bowling Green Soccer Club ($1,008). Appellant also used funds from the joint account to pay his child support ($4,150), to purchase a 2013 Chevrolet van from his father for $24,504.70, to pay $8,843.91 toward an auto loan for his 2013 Dodge Dart, and to pay $4,000 to his father.

**{¶ 40}** Finally, on April 10, 2015, appellant issued a cashier's check in the amount of $245,029.75 to Louisville Title in order to complete the purchase of the Perrysburg residence, opened an account with Farmers Merchant State Bank using $1,000 from the

20.

joint account, and paid off a $59,406.86 home equity account he held with Farmers Merchant State Bank. In sum, Kinder testified that appellant spent approximately $371,334.25 from the joint account within 11 days of transferring the money from the Trust.

{¶ 41} On May 15, 2015, following his expenditure of most of the $400,000 he borrowed from the Trust, appellant opened another account at Farmers Merchant State Bank. According to Kinder, this account was a business account for Searfoss Law, LLC, which appellant opened with an initial deposit of $1,319.10. On June 10, 2015, appellant made another payment on his home equity account using $16,000 from the joint account. Thereafter, on November 17, 2015, appellant transferred $10,000 from his business account with Farmers Merchant State Bank to the joint personal account with Union Bank.

{¶ 42} On January 19, 2016, appellant electronically transferred another $3,000 from the Trust bank account into the joint account. Kinder testified that his investigation recovered no promissory note associated with the $3,000 transfer. Kinder also noted that the transfer took place on the same day as the sale of the Perrysburg residence to appellant's father-in-law and mother-in-law.

{¶ 43} Kinder testified that the proceeds from appellant's sale of the Perrysburg residence, totaling $251,000, were transferred into appellant's joint checking account at Huntington Bank. Kinder explained his tracing of the money appellant used to purchase the Perrysburg residence, as follows:

21.

There was the $251,000 from the [Trust] account.  It came out of
that original $400,000 that was deposited.  [Appellant] then got the
cashier's check, he took it to Louisville Title, that is when he purchased the
house.  And then when they sold the house – when Katharine sold the
house to her parents – that money came back in, so it is basically proceeds
from the original.

{¶ 44} Following the sale of the Perrysburg residence, on February 5, 2016,
appellant made a payment on his home equity line of credit related to his Bowling Green
residence in the amount of $60,000 from the Huntington account.  Two weeks later,
appellant deposited $18,825.45 back into the Trust using funds from the Huntington
account, treating the deposit as a payment on the $400,000 loan.[1]  On June 27, 2016,
appellant borrowed another $3,000 from the Trust.[2]  Once again, Kinder's investigation
revealed that this loan was not evidenced by a promissory note.

{¶ 45} On November 21, 2016, appellant sold the 2013 Chevrolet van back to his
father for $21,850.  The proceeds from the sale were deposited into the joint Union Bank

---

[1] Appellant has maintained throughout these proceedings that he remained current on his payments under the terms of the promissory note evidencing the $400,000 loan.

[2] Appellant's removal of $3,000 from the Trust on January 19, 2016, and again on June 27, 2016, form the basis of the state's theft charges in counts eight and eleven of the indictment, respectively.

22.

account.  Using these proceeds, appellant made two deposits into the Trust totaling $15,456.32.

{¶ 46} On April 11, 2017, appellant withdrew another $4,000 from the Trust and deposited the funds into his business account.  Kinder noted that the withdrawal occurred on the same day that appellant met with Eric and presented him with the balance sheet for the Trust, prompting Eric's inquiry into the $400,000 loan.

{¶ 47} At the conclusion of Kinder's testimony, the state moved for admission of its exhibits.  The exhibits were admitted without objection, and the state rested.  Defense counsel then moved for an acquittal on all charges under Crim.R. 29.  Regarding the theft charges, counsel argued that appellant did not have the requisite mens rea because the beneficiary consent form, signed by Eric, granted him the authority to borrow the funds from the Trust.  Concerning money laundering, counsel contended that these charges would not survive an acquittal on the theft charges because the theft charges provided the predicate for the state to include money laundering within the indictment.  Alternatively, counsel urged that the state introduced no evidence to demonstrate that appellant attempted to conceal the proceeds from the Trust by transferring ownership of the Perrysburg residence to Katharine because the transfer was a matter of public record, and appellant's use of the funds did not promote the allegedly corrupt activity, namely theft. Finally, counsel argued that the engaging in a pattern of corrupt activity counts should be dismissed because there was no evidence of a criminal enterprise consisting of more than

23.

one criminal actor, and these counts were based upon the theft and money laundering counts that were similarly subject to dismissal.

{¶ 48} In response to appellant's Crim.R. 29 argument, the state contended that the consent relied upon by appellant was not effective because it was obtained through appellant's deception. In support of its argument, the state referenced appellant's duty to act in Eric's best interest and to refrain from commingling Trust funds with his own funds as a trustee under Chapter 5808 of the Ohio Revised Code, as well as the obligations to refrain from directly communicating with a represented person under Rule 4.2 of the Rules of Professional Conduct. The state noted that appellant communicated directly with Eric while knowing that Eric was represented by Hammer.

{¶ 49} Concerning the money laundering counts, the state argued that its evidence established that appellant had layered the funds he received from the Trust by purchasing the Perrysburg residence that he then convinced Jan and her husband to purchase, and transferring the remaining amount to Searfoss Law, LLC, then to his joint Union bank account. The state took issue with appellant's narrow definition of the "corrupt activity" contemplated under the money laundering statute, asserting that the appropriate definition of that term encompasses

> anything under Revised Code section 2923.31(I)(2)(c), which also includes all of the racketeering activities listed under federal RICO statute and Title 18 [of] the United States Code 1956 – which includes in one of its

24.

provisions any state felony offense – which is even broader than the specified state offenses in our statute.

{¶ 50} Regarding the engaging in a pattern of corrupt activity counts, the state contended that "a host of people, not just the defendant, not just Searfoss Law, but the testimony is that all of these entities or people were somehow associated, in fact, during different portions of the defendant's scheme to embezzle from the [Trust]." Further, the state argued that the counts were supported by evidence that appellant used the proceeds from the theft of Trust funds to make payments on his home equity lines of credit.

{¶ 51} Upon consideration of the parties' arguments, the court denied appellant's Crim.R. 29 motion. In announcing its decision, the court relied upon the state's evidence that the signature page on the $40,000 note from Eric to the Trust was identical to the signature page on the $400,000 note from appellant to the Trust, which Eric insisted he never signed. The court went on to find that the terms of the $400,000 loan were so favorable to appellant that it raised a question as to whether appellant had the requisite criminal intent to support the charges contained in the indictment.

{¶ 52} Following the trial court's denial of appellant's Crim.R. 29 motion, appellant took the stand as the sole witness during his case-in-chief. Early in his testimony, appellant recounted that he became acquainted with Eric during Eric's divorce from his ex-wife. Eric initially sought the legal services of Hammer, who referred Eric to appellant. In terms of complexity, appellant stated that Eric's divorce was "on the

25.

simpler side – but it did have like one contentious point." Appellant went on to explain that the Trust was the "central contentious issue" in Eric's divorce, because Eric's ex-wife was attempting to claim an interest in the Trust.

{¶ 53} At some point during the pendency of the divorce proceedings, Eric expressed to appellant his frustration with having Sun Trust act as trustee of the Trust. According to appellant, Eric expressed an interest in having the Trust moved to Ohio and managed by an individual trustee rather than a corporate trustee because he was unsatisfied with the inability to speak with someone face-to-face at Sun Trust. Appellant testified that he was asked by Eric to become the successor trustee, to which he replied "I don't do that. * * * It doesn't suit my talents and I would be concerned about handling that, but maybe."

{¶ 54} Throughout appellant's discussions with Eric, appellant learned that Eric had health issues and was concerned that his untimely death might negatively impact his children by allowing his ex-wife access to the Trust funds. In responding to Eric's concerns, appellant suggested that steps be taken to make the Trust funds less liquid so that Eric's children would not receive a lump sum cash distribution upon Eric's death. Appellant suggested investing the funds in promissory notes that would pay the Trust funds out over an extended period of time. Throughout these discussions, appellant explored the idea of borrowing money from the Trust with Eric, culminating in the drafting of the beneficiary consent form, which was admitted into evidence as Defendant's Exhibit X. According to appellant, the beneficiary consent form was

26.

provided to Eric in December 2014, prior to appellant's appointment as successor trustee in February 2015. Appellant testified that Eric signed the beneficiary consent form before a notary in March 2015.

{¶ 55} Regarding appellant's borrowing of Trust funds, appellant acknowledged that he had taken three loans from the Trust – a $400,000 loan, a $25,000 loan, and a $10,000 loan. Appellant testified that Eric signed the two-sided promissory note evidencing the $400,000 note without asking any questions. Appellant explained that he printed the document on both sides in order to allow him to place the document into a binder, which would help to facilitate better file organization. Appellant denied the allegation that he copied the signature page from the $40,000 note onto the $400,000 note.

{¶ 56} According to appellant, Eric was provided with a balance sheet on two separate occasions. Appellant testified that he provided Eric with the first balance sheet in November 2015. A copy of this balance sheet was admitted into evidence as Defendant's Exhibit H. The copy includes references to Searfoss Law, LLC's $400,000 loan and $25,000 loan, and contains Eric's signature as well as the signature of a witness, James Armstrong. Appellant stated that he provided appellant with a second balance sheet on April 11, 2017. A copy of this balance sheet, which was signed by Eric, was admitted into evidence as Defendant's Exhibit I. This balance sheet references loans to Searfoss Law, LLC, in amounts of $400,000, $25,000, and $10,000. Both of the balance

27.

sheets that appellant allegedly provided to Eric contain the following disclaimer language above Eric's signature:

> I, Eric Walker, acknowledge receiving a copy of this statement, all underlying documentation, approve and ratify all actions taken by Searfoss Law, LLC, Trustee to date, binding myself, my lineal descendants and the Alice Walker Trust to these actions.

{¶ 57} Appellant went on to explain the reasoning behind Eric's execution of the $40,000 promissory note. Appellant indicated that the note was generated at Eric's request because Eric wished to convey to Jodie that the money taken from the Trust would have to be repaid. Appellant acknowledged that he told Eric that the loan could be canceled if Eric did not want to pay it back. Eventually, Eric executed the $40,000 note at a meeting with appellant and Jodie at Panera in Perrysburg. Eric canceled the $40,000 note within two months of its execution.

{¶ 58} Appellant testified that he brought the $400,000 note with him to the meeting at Panera for Eric's execution, but Eric asked appellant to take the note back to his office because Eric did not want to discuss it in front of Jodie. According to appellant, Eric signed the $400,000 note "later that day on the way home or on the way in the morning the next day, I don't remember."

{¶ 59} On cross examination, the state began by asking appellant about his history of financial difficulties. Despite acknowledging several blemishes on his credit report and the existence of a judgment lien against him, appellant insisted that he thought he

28.

would be able to repay the loans he took from the Trust using income generated from his work as an attorney or as a guardian ad litem. The state pressed appellant as to whether his income expectations were reasonable in light of disciplinary proceedings that were pending against him when he took out the loans from the Trust. The state then asked appellant whether the result of the disciplinary proceedings impacted his financial condition, and appellant responded that the result of the disciplinary proceedings worsened his financial condition, prompting him to apply for Medicaid and food stamps.

{¶ 60} Next, the state questioned appellant about his understanding of "fiduciary duty" as that term was used in the Trust. In doing so, the state referenced the legal research materials containing portions of the Ohio Revised Code, which were seized from the Perrysburg residence by the state during the execution of the search warrant. Appellant objected to the state's reference to the Revised Code sections contained within the legal research, asserting that it was inappropriate to introduce sections of civil law into a criminal proceeding. The trial court overruled appellant's objection, finding that appellant's knowledge of his obligations under civil law was relevant to establishing whether appellant had the requisite mens rea to commit the crimes with which he was charged.

{¶ 61} After the trial court overruled appellant's objection, the state asked appellant to read R.C. 5808.02, 5808.04, 5808.06, 5808.09, 5808.10(A) and (B), and 5808.13(A). Upon reading each statutory section, appellant acknowledged that he was aware of the content of these statutes as early as October 15, 2014.

29.

{¶ 62} The state then shifted its focus to the Rules of Professional Conduct. The state asked appellant whether he was bound to comply with the Rules of Professional Conduct as an attorney in 2015 and 2016. Appellant affirmed that he was bound by such rules. The state then displayed a copy of Prof.Cond.R. 4.2 and asked appellant to read the rule. The state suggested that appellant's direct communications with Eric violated Prof.Cond.R. 4.2, to which appellant responded that he did not believe his actions violated Prof.Cond.R. 4.2 because Eric was no longer his client by the time he was appointed successor trustee.

{¶ 63} At the conclusion of appellant's testimony, defense counsel rested. Appellant's exhibits were admitted and appellant renewed his Crim.R. 29 motion, which was denied by the trial court. Defense counsel then proffered an objection in anticipation of the state's reference to civil law during its closing arguments, and the following discussion ensued:

> [DEFENSE COUNSEL]: Can I make one last statement? I'm sorry. I don't want to interrupt your closing – the State's closing argument – so I'm going to make an objection now and you can do with it what you will. The State's been arguing that as a result of purported violations of civil trust law, that Mr. Searfoss should somehow be found guilty. We object to that argument and think it's improper. The Judge rejected the efforts to have the jury be instructed on the law in that area, which we agreed with, and, therefore, we think it would be an improper argument to now rely

upon that law in an effort to seek to have Mr. Searfoss convicted. The same thing with regard to the Rules of Professional Responsibility, the State arguing what it means is improper. If there were a jury instruction on the issue, they would be properly instructed by the Judge. We don't think there should be one and we don't think it should have been admitted in the case. We think it would be an error to argue from it.

THE COURT: As I ruled previously, I will overrule your objection to his closing. The Rule of Professional Responsibility, the civil law that was found on the defendant's computer, the obligations of a fiduciary, those things are proof as to the criminal knowledge or the scienter requirement, not any other, so that was my ruling then and you would be again preserving your objection during closing.

{¶ 64} After appellant's objection was overruled, the state proceeded to recall Hammer as a rebuttal witness. Hammer indicated, contrary to appellant's testimony, that he did not direct appellant to call Eric and have him sign the beneficiary consent form. Hammer further testified that he had not reviewed the beneficiary consent form prior to its execution on March 5, 2015.

{¶ 65} At the conclusion of Hammer's testimony, the trial court instructed the jury and the matter proceeded to closing arguments. During its closing argument, the state referenced certain provisions of civil law and the Rules of Professional Conduct, stating:

31.

Now, as the defendant said, he can't validly consent if you have been deceived. The definition of deception is critically important in this case, not simply because it's a theft case, but because it is a theft case where the defendant was a trustee. Somebody who owes fiduciary duties – special duties – what some might consider sacred duties.

Now, according to the law, he had duties to disclose information to Mr. Walker. He has duties to timely advise him of what was going on with the assets of the trust. He has a duty not to commingle, and we are going to look at a summary of the very law that the defendant researched as he was concocting this scheme. "The trustee shall administer the trust solely in the interest of the beneficiary." He even highlighted his own copy of a Trust Agreement that said he had to operate in accordance with his fiduciary duties. He recognized as far back as October 2014 that there were very high expectations for him as a trustee. He was told by the law that he must administer it as a prudent person would and that he shall consider the purposes, terms, distributional requirements, and other circumstances of the trust and that in satisfying that standard, the trustee shall exercise reasonable care, skill, and caution. He knew that under the law, he had to use his special skills or expertise. * * * But, perhaps the two most important ones are the last two, Revised Code section 5808.10(B), "A trustee shall keep trust property separate from the trustee's own property." Folks, I want

you to read that again for yourself and then I have a question for you. Is there any ambiguity whatsoever in that law? Does it make exceptions, what if's, if you are on hard times? Absolutely not. And the defendant knew that before he started drafting documents, moving money, and ultimately converting it to his own use. Ultimately, Revised Code section 5808.13 specifically provides that he shall promptly provide the beneficiary an account for the trust.

* * *

What do we know about other deceptive acts? Number one, Professional Conduct Rule 4.2 applies to all attorneys. Number two, the defendant knew that Mr. Hammer was representing Mr. Walker for purposes of the trust as early as October of '14. They shared office space in the same building. They texted each other frequently, e-mailed each other frequently, spoke with one another and worked out other matters. However, when you look at the e-mails from Mr. Hammer and Mr. Walker and Mr. Searfoss, you will not see one e-mail between the defendant and Mr. Hammer that says, I need to talk to you about the beneficiary consent, or please find a copy for your review of the beneficiary consent.

{¶ 66} In response to the state's reference to civil law during its closing argument, defense counsel stated during appellant's closing argument that, while the Revised Code sections referenced by the state do indeed prohibit commingling of funds, other sections

33.

permit such commingling so long as the beneficiary consents. Defense counsel added: "So even under the trust law, [appellant] was trying to follow it and do it the right way to take care of the issues Eric had and the issues he had – that's not a crime."

{¶ 67} The state followed up on appellant's closing argument by urging the jury that "[t]his isn't about contract law, it's about the commission of crimes. Did the Court instruct you on law about the beneficiary avoiding a contract? No, because it is not about contract law, it's about committing a crime."

{¶ 68} Following closing arguments, the jury received its final instructions from the trial court and began its deliberations. Four hours later, the jury returned guilty verdicts on all 14 counts. A brief forfeiture hearing was held, and after deliberating for another three hours, the jury found that the following property was subject to forfeiture: appellant's right, title and interest in the cash taken from the Trust, appellant's Bowling Green residence, the Perrysburg residence, the 2013 Dodge Dart, appellant's membership interest in Searfoss Law, LLC, and appellant's position as trustee of the Trust. Thereafter, the matter was continued for sentencing.

{¶ 69} Appellant's sentencing hearing was held on January 17, 2018. Prior to the hearing, appellant filed a "Motion to Merge Counts for Sentencing," in which appellant argued that the six theft counts should merge because appellant committed them as a series of offenses in his capacity as trustee of the Trust. Additionally, appellant contended that the four money laundering counts should merge because each count addressed the same course of conduct, namely appellant's use of the funds received from

34.

the Trust. Finally, appellant urged the trial court to merge the four counts of engaging in a pattern of corrupt activity because the evidence established "only one pattern and only one enterprise."

{¶ 70} In response to appellant's motion, the state stipulated that the theft offenses were subject to merger under Ohio law. However, the state rejected appellant's assertion that the money laundering counts should merge, contending that the offenses were committed on different dates and involved different transactions. Moreover, the state asserted that the counts for engaging in a pattern of corrupt activity should not merge because offenses under R.C. 2923.32(A)(3) are "transaction-specific" and the counts pertain to different transactions.

{¶ 71} Ultimately, the court merged the theft offenses, declined to merge the money laundering counts after finding that each count was committed with a separate animus, and merged the engaging in a pattern of corrupt activity counts. The court then imposed prison sentences of 36 months for aggravated theft, 36 months for each of the four counts of money laundering, and five years for engaging in a pattern of corrupt activity. These sentences were ordered to be served consecutively for an aggregate prison sentence of 20 years. In addition to the prison sentence, the trial court ordered appellant to pay restitution in the amount of $400,718.23. Appellant's timely notice of appeal followed.

{¶ 72} Following appellant's filing of his notice of appeal in case No. WD-18-005, the state filed two notices of appeal in case Nos. WD-18-007 and WD-18-008. On March

9, 2018, we issued an order consolidating these appeals under case No. WD-18-005 and designating the state as cross-appellant. The parties filed their respective briefs in this consolidated, and the matter proceeded to oral arguments on June 5, 2019. The matter is now decisional.

## B. Assignments of Error

{¶ 73} On appeal, appellant assigns the following errors for our review:

1. The trial court committed reversible error by permitting the State's investigator to testify by PowerPoint presentation to the jury, where the PowerPoint itself was inadmissible hearsay, included inadmissible out-of-court statements of the accuser, and the investigator improperly opined regarding the credibility of the accuser.

2. The trial court committed reversible error by permitting the State to seek to convict based on purported violations of civil law and the Ohio Rules of Professional Conduct, where the State misstated the law, and the trial court declined to instruct the jury on the correct law.

3. There was insufficient evidence to convict Searfoss of money laundering.

4. The State committed reversible error by opining regarding the credibility of Searfoss in closing argument, by denigrating defense counsel through inappropriate questions and remarks, and by misrepresenting the civil law and evidence throughout the trial.

36.

{¶ 74} Additionally, the state raises the following assignments of error as cross-appellant:

1. The trial court erred when it refused to properly instruct the jury on the law of this state regarding the legal duties and restrictions of a trustee.

2. The trial court erred when it denied the State's liminal motion and failed or refused to apply the "public policy" doctrine in a criminal case.

3. The trial court erred when it merged counts three, five, ten, and fourteen at sentencing.

{¶ 75} For ease of discussion, we will address these assignments of error out of order. We will begin by addressing appellant's third assignment of error. We will then address appellant's first and second assignments of error together, as they are interrelated. We will also address the state's second cross-assignment of error together with appellant's second assignment of error. Finally, we will review appellant's fourth assignment of error. Our resolutions of appellant's assignments of error render the state's first and third cross-assignments of error moot, and we do not address them.

## II. Analysis

### A. Money Laundering

{¶ 76} In appellant's third assignment of error, he argues that the state presented insufficient evidence to support his convictions for money laundering. Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins*, 78 37.

Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). In reviewing a challenge to the sufficiency of evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses. *State v. Walker*, 55 Ohio St.2d 208, 212, 378 N.E.2d 1049 (1978).

{¶ 77} The money laundering statute at issue here, R.C. 1315.55, provides, in relevant part:

(A)(2) No person shall conduct or attempt to conduct a transaction knowing that the property involved in the transaction is the proceeds of some form of unlawful activity with the intent to conceal or disguise the nature, location, source, ownership, or control of the property * * *.

(3) No person shall conduct or attempt to conduct a transaction with the purpose to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of corrupt activity.

{¶ 78} Here, appellant was convicted of two counts of money laundering under R.C. 1315.55(A)(2), counts four and seven in the indictment, and two counts of money laundering under R.C. 1315.55(A)(3), counts two and nine in the indictment. Count two of the indictment was premised upon appellant's use of the proceeds from the $400,000 stolen from the Trust to purchase the Perrysburg residence. Appellant does not challenge

38.

the state's evidence with respect to the "corrupt activity" element under R.C. 1315.55(A)(3), as that element is established by virtue of appellant's convictions for aggravated theft in violation of R.C. 2913.02. *See* R.C. 1315.51(B) and 2923.31(I)(2)(c).

{¶ 79} Regarding count two, appellant argues that the evidence does not support a finding that he purchased the residence with the purpose to promote, manage, establish, or carry on his theft of the Trust funds. Rather, appellant urges that he purchased the residence in order to accommodate his large family. Appellant notes that he followed the normal course of acquiring a primary residence by utilizing a real estate agent, soliciting a home inspection, executing a real estate purchase agreement, and giving all necessary closing documents prior to moving his family into the Perrysburg residence. Appellant also references the fact that the transaction was "duly and publicly recorded with the Wood County Recorder." Ultimately, appellant concludes that he was convicted of money laundering under count two merely because he *spent* the money that he improperly removed from the Trust.

{¶ 80} In response, the state argues that appellant promoted his theft by "layering" the Trust funds through acquiring an equity interest in the Perrsyburg residence using a facially legal transaction. At trial, Kinder explained the concept of layering as follows:

> Layering is basically once the money has been placed, whether it's a
> bank account or wherever it is going to be, layering is moving that money
> into different accounts or paying different things with it or gaining equity or

39.

something of value that can hold on and maybe – it is basically a way of trying to clean the money to show it was put to a legitimate use.

{¶ 81} While acknowledging appellant's assertion that he acquired the Perrysburg residence merely to use it as a family residence, the state contends that the jury was free to reject appellant's explanation and credit Kinder's testimony that appellant's purchase constituted money laundering through layering.

{¶ 82} In support of its argument that the real estate transaction here may be used to demonstrate appellant's purpose to promote theft, the state cites *State v. Rhodehamel*, 10th Dist. Franklin No. 11AP-96, 2011-Ohio-5618. In that case, the state introduced bank records into evidence, which established that Rhodehamel, a property manager, utilized funds he stole from client escrow accounts and an account belonging to his employer to purchase a condominium in Florida. *Id.* at ¶ 16. Because the purchase of the condominium involved proceeds from the thefts that exceeded $10,000, Rhodehamel was convicted of money laundering under R.C. 1315.55(A)(4), which provides:

> No person shall conduct or structure or attempt to conduct or structure a transaction that involves the proceeds of corrupt activity that is of a value greater than ten thousand dollars if the person knows or has reasonable cause to know that the transaction involves the proceeds of corrupt activity.

{¶ 83} Notably, the statutory section at issue in *Rhodehamel* was R.C. 1315.55(A)(4), not R.C. 1315.55(A)(3). Thus, unlike here, the prosecution in

40.

*Rhodehamel* was not required to establish that the expenditure of the stolen funds was done with the purpose to promote the theft. As such, we find that *Rhodehamel* is distinguishable from the present case and thus provides no support for a conviction under R.C. 1315.55(A)(3).

{¶ 84} Upon our thorough consideration of the evidence introduced by the state, we find no support for the state's suggestion that appellant purchased the Perrysburg residence with the purpose to promote corrupt activity. While it is true that Kinder testified as to the process of money layering, such opinion is not evidence of money laundering in this case. It is also the case that the state failed to introduce any evidence to demonstrate that appellant employed such a strategy in order to promote further theft of the Trust funds. Instead, the record clearly establishes that appellant purchased the home so that he and his family could (and did) reside there after the theft offense was already completed.

{¶ 85} In essence, the evidence here, when viewed in a light most favorable to the prosecution, establishes that the money laundering charge in count two is based merely upon appellant's expenditure of the stolen Trust funds. The expenditure of the funds on real estate in no way furthered appellant's theft. Under Ohio law, "[t]he act of transacting money alone does not amount to money laundering. Instead, one must transact with the 'purpose to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of corrupt activity.'" *State v. Pugh*, 9th Dist. Summit No. 24905, 2010-Ohio-2741, ¶ 13, quoting R.C. 1315.55(A)(3).

41.

{¶ 86} Although there is a dearth of case law in Ohio construing the promotion prong of Ohio's money laudering statute, federal courts have examined a similar promotion provision within the federal money laundering statute, 18 U.S.C. 1956(a)(1)(A)(i).[3] Because the federal money laundering statute is similar to Ohio's money laundering statute, we will consider the relevant federal case law. Looking at the federal money laundering statute in *United States v. Brown*, 186 F.3d 661 (5th Cir.1999), the Fifth Circuit Court of Appeals cautioned:

> We have previously stressed the importance of not turning the "money laundering statute into a 'money spending statute.'" *See United States v. Leonard*, 61 F.3d 1181, 1185 n.2 (5th Cir.1995) (quoting *United States v. Sanders*, 928 F.2d 940, 946 (10th Cir.1991)). Strictly adhering to the specific intent requirement of the promotion element of [18 U.S.C.

---

[3] 18 U.S.C. 1956(a)(1) provides, in relevant part:

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity –

(A)(i) with the intent to promote the carrying on of specified unlawful activity; or

\* \* \*

shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

1956(a)(1)(A)(i)] helps ensure that the money laundering statute will punish conduct that is really distinct from the underlying specified unlawful activity and will not simply provide overzealous prosecutors with a means of imposing additional criminal liability any time a defendant makes benign expenditures with funds derived from unlawful acts.

*Id.* at 670.

{¶ 87} In *United States v. McGahee*, 257 F.3d 520 (6th Cir.2001), the Sixth Circuit reversed a federal promotion-prong money laundering conviction that was based upon the defendant's use of fraudulently obtained funds to pay his personal mortgage, a personal loan, and a car loan. In reversing the conviction, the court stated "[p]aying for personal goods, alone, is not sufficient to establish that funds were used to promote an illegal activity," and explained that the transaction at issue must be "explicitly connected to the mechanism of the crime" in order to demonstrate the promotion of criminal activity." *Id.* at 527. The court went on to reject the government's theory that the defendant could be prosecuted for utilizing proceeds of the fraud to pay his mortgage payment under the money laundering statute because his residence "did not play an integral part in the embezzlement scheme. Using his home address as his business address was merely a convenience. Paying his mortgage was not only a legitimate business expense, it was a necessary personal expense." *Id.*

{¶ 88} Similarly, in *United States v. Olaniyi-Oke*, 199 F.3d 767 (5th Cir.1999), the Fifth Circuit overturned a money laundering conviction under both the promotion and

43.

concealment prong of the federal statute, where the conduct forming the basis of the conviction was the defendant's unauthorized use of another's credit card to purchase two personal computers. Because the government introduced no evidence to demonstrate that the defendant intended to use these computers to promote further unlawful activity, the court held that the use of the proceeds did not constitute money laundering. *Id.* at 770. Notably, the court pointed out that "[t]he government's argument would convert every purchase of goods with illegally obtained credit into money laundering, which we have rejected: Money spending is not criminal under [18 U.S.C. 1956(a)(1)]." *Id.* at 771.

{¶ 89} Because the state failed to introduce sufficient evidence to demonstrate that appellant purchased the Perrysburg residence "with the purpose to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of corrupt activity," as required under R.C. 1315.55(A)(3), appellant's conviction under count two must be reversed.

{¶ 90} Next, we turn to count nine, which charged appellant with violating 1315.55(A)(3) based upon appellant's sale of the Perrysburg residence to Jan and her husband. Regarding count nine, appellant argues that the state failed to introduce evidence to establish that he sold the Perrysburg residence with the purpose to "promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on" of his alleged theft of funds from the Trust. R.C. 1315.55(A)(3). Rather, appellant insists that the evidence only supports the conclusion that he sold the Perrysburg residence in order to address his family's financial concerns.

44.

**{¶ 91}** In responding to appellant's argument concerning count nine, the state maintains: "The fact that the transaction was properly recorded does not alter the fact that Appellant engaged his wife to make the sale in promotion of the theft." In supporting its summary contention, the state relies exclusively on *State v. Copeland*, 12th Dist. Butler No. CA2003-12-320, 2005-Ohio-5899.

**{¶ 92}** Having reviewed *Copeland*, we find it inapplicable in this context. Indeed, the money laundering charge at issue in *Copeland* was brought under the concealment prong of R.C. 1315.55(A)(2), leading Copeland to argue that "the state failed to sufficiently prove he acted to 'hide' the money * * *." *Id.* at ¶ 57. Thus, the promotion element under R.C. 1315.55(A)(3) was not an issue in *Copeland*. Therefore, the state's reliance on *Copeland* is misplaced and provides no support for a conviction under R.C. 1315.55(A)(3).

**{¶ 93}** We have carefully reviewed the entire record as it pertains to appellant's sale of the Perrysburg residence to Jan and her husband, and we have found no evidence to support the state's contention that appellant sold the Perrysburg residence in an effort to promote further corrupt activity. At trial, Jan testified that appellant asked her to purchase the Perrysburg residence from him so that he could use the proceeds from the sale to pay for legal fees stemming from disciplinary proceedings. Jan further testified that appellant and Katharine experienced periodic financial difficulties in their marriage. This testimony was corroborated by Katharine, who testified that her family began to experience financial difficulties during the fall of 2015. Due to such financial

45.

difficulties, appellant suggested to Katharine that they sell the Perrysburg residence to Katharine's parents. Katharine testified that the proceeds from the sale of the Perrysburg residence were used to pay off family debts. The state introduced no evidence to refute this testimony, but instead relies upon the transfer alone as support for the money laundering conviction.

{¶ 94} The unrefuted testimony introduced at trial establishes that appellant sold the Perrysburg residence so that he could use the proceeds to pay off other financial obligations and address his family's financial concerns, not to reinvest the proceeds into further corrupt activity. While the evidence clearly demonstrates that appellant was living beyond his means, that fact does not equate to promoting corrupt activity. Hence, the state failed to introduce sufficient evidence to establish the promotion element in count nine, and that conviction must be reversed.

{¶ 95} Next, we will address count four of the indictment, which was based upon appellant's transfer of title to the Perrysburg residence from himself to Katharine. As noted above, this count is premised upon a violation of R.C. 1315.55(A)(2), the concealment prong of the money laundering statute. Consequently, the state was required to introduce evidence that appellant transferred the title "with the intent to conceal or disguise the nature, location, source, ownership, or control of the property * * *." R.C. 1315.55(A)(2).

46.

{¶ 96} According to the testimony provided by appellant and Katharine, appellant transferred title to the residence in an effort to reduce the cost of insurance on the property. Appellant reasoned that the insurance premium would decrease as a result of the transfer, because he had previously filed a fire loss claim pertaining to a previous residence. Thus, appellant executed a deed transferring title to Katharine, and recorded the deed with the Wood County Recorder.

{¶ 97} Concerning count four, appellant argues that the state's evidence was insufficient to establish that he acted with an intent to conceal, especially in light of his public recording of the transaction. In support, appellant cites two federal Circuit Court cases.

{¶ 98} In the first cited case, *United States v. Rockelman*, 49 F.3d 418 (8th Cir.1995), Rockelman was convicted of, inter alia, money laundering under the concealment prong of the federal money laundering statute, 18 U.S.C. 1956(a)(1)(B)(i),[4]

---

[4] The federal concealment prong is substantially similar to the Ohio concealment prong, and provides:

> (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity –
>
> * * *
>
> (B) knowing that the transaction is designed in whole or in part –

47.

based upon his purchase of a cabin with proceeds from his illegal drug sales. Rockelman argued that the government failed to prove that he acted with an intent to conceal, noting that he had the title to the cabin put in the name of R&R Electric and Appliances, a company that was owned and controlled by him. *Id.* at 422.

{¶ 99} On review, the Eighth Circuit agreed that the state's evidence was insufficient to establish that Rockelman intended to conceal the transaction, as there was no attempt to conceal from the realtors Rockelman's identity, his ownership of the $16,675 in cash used to purchase the cabin, his ownership of R&R Electric and Appliances, or his connection to the transaction. *Id.* Moreover, the court observed that Rockelman's ownership of R&R Electric and Appliances was a matter of public record, and the transfer of title to the cabin first to R&R Electric and Appliances, and then to the son of Rockelman's girlfriend, were on file at the county courthouse. *Id.* On these facts, the court characterized the purchase of the cabin as a "straightforward real estate transaction" and found that "Rockelman's conspicuous connection with the property

---

> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or
>
> * * *
>
> shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

48.

bought with the proceeds of his drug sales convinces us that the evidence here cannot support a finding that Rockelman had the necessary intent to conceal that would satisfy the money laundering statute." *Id.*

{¶ 100} In the second case cited by appellant, *United States v. Sanders*, 929 F.2d 1466 (10th Cir.1991), Sanders was convicted of several offenses, including two counts of money laundering under the concealment prong of the federal statute, as a result of her purchase of two automobiles – a Volvo and a Lincoln, the latter of which was titled in her daughter's name upon purchase. Sanders argued that these convictions were not supported by sufficient evidence of an intent to conceal the nature, source, ownership, or control of proceeds of her unlawful drug activity, because she and her husband were present when the cars were purchased, they conspicuously used the cars after they were purchased, and her relationship to her daughter would be obvious given their same last name. *Id.* at 1471.

{¶ 101} In response to Sanders' argument, the government focused on the purchase of the Lincoln, and contended that a finding of an intent to conceal was supported by Sanders' use of cash to pay for the Lincoln, the titling of the vehicle in her daughter's name, the fact that she signed her daughter's name on the purchase agreement for the Lincoln, and the fact that her daughter was never observed driving the vehicle. *Id.* at 1472.

{¶ 102} On review before the Tenth Circuit, the money laundering convictions were found to be unsupported by sufficient evidence as to the intent to conceal element.

49.

Regarding Sanders' purchase of the Lincoln and the titling of the vehicle in her daughter's name, the court found:

> Although Mr. Sanders titled the Lincoln in his daughter's name, and Mrs. Sanders signed the daughter's name to the car purchase agreement, we conclude that the daughter's presence in person at the car lot during or somewhat subsequent to the transaction, the fact that the daughter shared the family last name, and defendant's and her husband's conspicuous use of the car after the purchase, undermine the government's argument (based in large part upon the titling of the car in the daughter's name), that the Lincoln purchase involved the requisite design of concealment.

*Id.* at 1472-1473.

{¶ 103} Having examined *Rockelman* and *Sanders* in light of the facts of the case sub judice, we find that these cases support appellant's contention that the state failed to introduce sufficient evidence to establish that his transfer of ownership of the Perrysburg residence from himself to Katharine was done with an intent to conceal. Notably, the state relied exclusively upon the transfer itself as support for its money laundering charge under count four. As in *Rockelman*, the transfer of ownership in this case was a matter of public record, having been recorded with the Wood County Recorder. Further, appellant continued to reside in the home with Katharine after the transfer of title, and the two share the same last name, just as in *Sanders*.

50.

{¶ 104} In its brief, the state also cites federal authority in opposing appellant's sufficiency argument under count four. However, the authority cited by the state is inapposite and factually distinguishable.

{¶ 105} The first case relied upon by the state, *United States v. Miles*, 360 F.3d 472 (5th Cir.2004), is inapposite. Once again, the state's case support relies on analysis of a different prong of the money laundering statute. *Miles* involved a money laundering conviction under the promotion prong of the federal statute, not the concealment prong. The second case cited by the state, *United States v. Kaczowski*, 882 F.Supp. 304 (W.D.N.Y.1994), involved the deposit of money derived from illegal bookmaking activities into escrow, followed by payment of the money to the Internal Revenue Service as ostensibly legitimate tax obligations of a business entity. The court in *Kaczowski* found that this practice concealed the illegal source of the money, as required under the concealment prong of the federal money laundering statute. *Id.* at 308. Here, appellant's transfer of ownership was publicly recorded. With that in mind, we find that the money laundering scheme in *Kaczowski* was fundamentally different from the facts in this case. Thus, the state's reliance on *Kaczowski* is misplaced.

{¶ 106} We recognize that *Rockelman* and *Sanders*, federal cases applying federal law, are not binding on this court. However, we also note that the federal concealment prong is nearly identical to the concealment prong contained in R.C. 1315.55(A)(2). Indeed, both statutes demand evidence that the transaction was conducted with the intent to conceal or disguise the nature, location, source, ownership, or control of the property.

51.

Given the similarities between the statutes, we find that *Rockelman* and *Sanders* provide helpful guidance in ascertaining whether the state's evidence was sufficient to establish an intent to conceal in this case.

{¶ 107} On review of the record in this case, we find no support for the state's claim that appellant's transfer of title was undertaken with an intent to conceal. Rather, we find that appellant's transfer of title to the Perrysburg residence was open and conspicuous. Therefore, we find that appellant's money laundering conviction under count four is not supported by sufficient evidence, and must be reversed and vacated.

{¶ 108} Finally, we turn to count seven of the indictment, which was founded upon appellant's transfer of $22,000 in Trust proceeds from his Searfoss Law, LLC business account into his personal bank account. Appellant argues that his movement of the funds from one account bearing his name to another account bearing his name was not sufficient to establish an intent to conceal.

{¶ 109} In support, appellant cites a number of federal cases, including *United States v. Blankenship*, 382 F.3d 1110 (11th Cir.2004). In *Blankenship*, the Eleventh Circuit held that there was insufficient evidence to prove an intent to conceal the defendant's transfer of funds derived from an affirmative action fraud scheme from his business account to his personal account, which gave rise to the federal money laundering charge. The court found that the intent to conceal could not be demonstrated where the defendant's name was on both the account from which the money was transferred and the account into which the money was transferred. *Id.* at 1128. The court noted that the

52.

defendant "did not receive—and could not reasonably have anticipated receiving—any marginal increase in secrecy by moving the money from one account with his name on it to another account with his name on it at the same bank." *Id.* at 1129.

{¶ 110} Two years after its decision in *Blankenship*, the Eleventh Circuit issued its decision in *United States v. Johnson*, 440 F.3d 1286 (11th Cir.2006). In *Johnson*, the court examined whether an intent to conceal could be established based upon the transfer of money from the defendant's account into his mother's account. The court reviewed federal precedent bearing on this issue and concluded that

> a money laundering concealment conviction pursuant to [18 U.S.C. 1956] requires evidence of something more than a simple transfer of funds between two accounts, each bearing the parties' correct name. There must be some evidence that the funds are more concealed after the transaction is completed than before.

*Id.* at 1293, citing *United States v. Garcia–Emanuel*, 14 F.3d 1469, 1478 (10th Cir.1994) (holding that transferring funds from an account in the defendant's name to an account of a Colombian national in Florida was insufficient to support a federal concealment money laundering conviction), and *United States v. Dobbs*, 63 F.3d 391, 397 (5th Cir.1995) (reversing a federal concealment money laundering conviction where the defendant deposited illicitly obtained funds into his wife's bank account).

{¶ 111} The money laundering conviction under count seven in this case is premised upon appellant's transfer of $22,000 in Trust proceeds from his Searfoss Law,

LLC business account into his personal bank account. Both of these accounts bear appellant's name. As such, this case in analogous to *Blankenship*. Moreover, the facts in this case are even less indicative of concealment than those deemed insufficient to support a money laundering conviction in *Johnson*, *Garcia–Emanuel*, and *Dobbs*, all of which involved a transfer of money from the defendant's account into a third party's account.

{¶ 112} The state does not contest the fact that appellant's name is on both accounts at issue in count seven. Rather, the state relies upon Kinder's testimony that an intent to conceal is the only logical explanation for the transfer. At trial, Kinder offered no evidentiary support for his conclusion that appellant transferred the Trust proceeds with an intent to conceal. We find Kinder's conclusory statement insufficient because the business, as trustee of the Trust, was the entity that was used by appellant to take the funds from the Trust. If appellant wished to make personal use of these funds taken from Searfoss Law, LLC, he would have to first transfer the funds from his Searfoss Law, LLC account into his personal account.

{¶ 113} Consistent with *Johnson*, *Garcia–Emanuel*, and *Dobbs*, we find that evidence of appellant's transfer of funds from his business account into his personal account, standing alone, is insufficient to establish the intent to conceal necessary to support a charge of concealment money laundering under R.C. 1315.55(A)(2). Without sufficient evidence to support it, we find that appellant's money laundering conviction under count seven must be overturned.

54.

**{¶ 114}** Stripped to its essence, this case is really a simple theft case in which appellant acquired control of Trust funds without authority. At trial, the state took the expansive view that "a host of people" were associated with appellant's "scheme to embezzle from the [Trust]." However, the evidence demonstrates that appellant acted alone in removing the money from the Trust in order to spend it on personal items. The record is devoid of any evidence which would support the money laundering counts in the indictment. Because the record contains insufficient evidence to support these counts, we find that each of appellant's four money laundering convictions must be reversed and vacated. Accordingly, appellant's third assignment of error is well-taken.

### B. Evidentiary Concerns

**{¶ 115}** In appellant's second assignment of error, he argues that the trial court erred by allowing the state to introduce evidence of his purported violations of civil laws under the Trust Code, R.C. Chapters 5801 to 5811, as well as certain provisions of the Rules of Professional Conduct. Relatedly, appellant argues in his first assignment of error that the trial court erred in allowing the state to display improper evidence contained within Kinder's PowerPoint presentation to the jury during Kinder's testimony.

**{¶ 116}** We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 122. Abuse of discretion connotes that that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

55.

{¶ 117} The dispute concerning the state's reference to the Trust Code and the Rules of Professional Conduct first arose following the state's pretrial filing of a "request for jury instructions re: legal duties and restrictions of a trustee." In its motion, the state requested that the jury be instructed on portions of trust law governing trustees under Chapter 5808 of the Revised Code.[5] Appellant opposed the state's requested instructions, arguing that they "have absolutely no role in a criminal case." Ultimately, the trial court rejected the state's requested instructions, finding that "[t]he State's requested jury instructions, while accurate statements of law, would be relevant in a civil case against a Trustee; the instructions are not relevant in a theft, money laundering, engaging case."

{¶ 118} Notwithstanding the trial court's conclusion that the Trust Code provisions referenced in the state's requested jury instructions were irrelevant in this criminal matter, the state proceeded to reference the Trust Code in its cross examination of appellant at trial. The record reflects that, after asking appellant about his understanding of the term "fiduciary duty," the state referenced legal research materials that were seized from appellant's residence, which contained references to certain provisions of the Trust Code. Appellant objected to the state's reference to the Trust Code provisions, asserting that it was inappropriate to introduce sections of civil law into a criminal proceeding. Because it found that appellant's knowledge of his obligations as

---

[5] Specifically, the state's request references R.C. 5808.02(A), 5808.04, 5808.06, 5808.09, 5808.10(B), and 5808.13(A).

56.

trustee under the Trust Code was relevant to the issue of mens rea, the trial court overruled appellant's objection. Thereafter, the state asked appellant to read the Trust Code provisions into the record. Additionally, the state asked appellant to read from Prof.Cond.R. 4.2, and suggested that appellant's direct communications with Eric violated the rule. The state thus accomplished that which the trial court's ruling on the state's motion in limine had apparently prohibited.

{¶ 119} Prior to closing arguments, appellant reasserted his objection to the state's references to the Trust Code and the Rules of Professional Conduct. The trial court overruled the objection, finding that appellant's legal research was "proof as to the criminal knowledge or the scienter requirement."

{¶ 120} Additionally, during its closing argument, the state referenced several provisions of the Trust Code and the Rules of Professional Conduct. At one point, the state read R.C. 5808.10(B) to the jury, and then asked the jury: "Is there any ambiguity whatsoever in that law? Does it make exceptions, what if's, if you are on hard times? Absolutely not. And the defendant knew that before he started drafting documents, moving money, and ultimately converting it to his own use."

{¶ 121} The state's references to the Trust Code and the Rules of Professional Conduct in closing prompted defense counsel to note in his closing argument that the Revised Code does indeed contain an exception to the rule against commingling of trust funds so long as the beneficiary consents. Defense counsel then stated: "So even under the trust law, [appellant] was trying to follow it and do it the right way to take care of the

issues Eric had and the issues he had – that's not a crime."  In rebuttal, the state

responded to defense counsel's statement by noting that "[t]his isn't about contract law,

it's about the commission of crimes.  Did the Court instruct you on law about the

beneficiary avoiding a contract?  No, because it is not about contract law, it's about

committing a crime."  Earlier on in the trial, defense counsel asked Kinder whether the

Revised Code sections retrieved from appellant's residence permitted a trustee to

"interact personally with the assets of a trust if the beneficiary consents."  The state

objected to the question, arguing that the document (appellant's legal research) speaks for

itself.  The trial court agreed, and sustained the state's objection.

{¶ 122} In addition to its references to, and reliance upon, certain provisions of the

Trust Code, the state also mentioned appellant's alleged violation of Prof.Cond.R. 4.2.

During its direct examination of Hammer, the state read Prof.Cond.R. 4.2, and then asked

Hammer if appellant had ever sought his consent to speak directly with Eric.  Hammer

responded in the negative, implying a violation of Prof.Cond.R. 4.2.

{¶ 123} Under his second assignment of error, appellant contends that it is within

the trial court's sole province to instruct the jury as to the law.  Thus, appellant argues

that the trial court erred when it allowed the state to reference the Trust Code and the

Rules of Professional Conduct in its closing argument, thereby supplanting the trial

court's exclusive role.  We agree.

{¶ 124} Witness testimony as to the applicable legal standard that governs a

particular case is improper because it usurps the duty and province of the trial court to

58.

instruct the jury on the law. *State v. Rakes*, 3d Dist. Paulding No. 11-97-9, 1997 WL 791525, \*3 (Dec. 30, 1997), fn. 2. Stated succinctly, "[i]nstructions regarding the pertinent law must come from the court." *State v. Clark*, 2d Dist. Clark No. 2013 CA 52, 2014-Ohio-855, ¶ 26.

{¶ 125} In *State v. Johnson*, 10th Dist. Franklin No. 02AP-373, 2002-Ohio-6957, the Tenth District reversed a conviction for felonious assault after finding that police officers provided improper opinion testimony as to whether they would have fired upon the victim under the circumstances of the case. The court found that the error in admitting this testimony was compounded by the fact that one of the officers testified regarding "the applicable law governing the use of force in self-defense situations * * *. This testimony did not comport with the instructions given by the trial court on self-defense, and constituted inadmissible opinion testimony on the applicable legal standard." *Id.* at ¶ 43, citing *United States v. Scop*, 846 F.2d 135, 140 (2d Cir.1988) (finding that it was prejudicial error to allow a witness to give expert legal testimony "calculated to 'invade the province of the court to determine the applicable law and to instruct the jury as to that law'"). The court went on to note the possibility that the jury could be misled into adopting the legal conclusion offered by the witness, but found that the testimony was objectionable even if the jury was not so misled because it was "'communicating a legal standard – explicit or implicit – to the jury.'" *Id.*, quoting *Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir.1992).

59.

{¶ 126} In this case, the trial court refused to instruct the jury as to the Trust Code provisions contained in appellant's legal research materials, because it found that such provisions were not relevant to this criminal proceeding. Notwithstanding this finding, the state repeatedly referenced the Trust Code, and elected to read the provisions verbatim at trial, also eliciting testimony from its witnesses as to whether appellant's conduct violated the terms contained therein. The state further muddied the waters when it referenced the Rules of Professional Conduct and suggested that appellant violated Prof.Cond.R. 4.2 by directly communicating with Eric. In so doing, the state set the stage for the jury to improperly hold appellant criminally accountable for his alleged violation of non-criminal statutes pertaining to a trustee's fiduciary duty and rules governing the practice of law. This connection was further solidified during the state's closing argument, when the state relied upon appellant's violation of the prohibition against trustee commingling contained in R.C. 5808.10(B) to make its case concerning the charges of theft, money laundering, and engaging in a pattern of corrupt activity.

{¶ 127} After selectively referring to the Trust Code and Rules of Professional Conduct throughout the trial, the state insisted that appellant's reliance upon the consent provision in R.C. 5808.02(B)(4) should be disregarded because it had no bearing on appellant's criminal liability and the court did not provide instructions as to that issue. In other words, the state used certain Trust Code provisions to persuade the jury that appellant breached his fiduciary duty and should therefore be held criminally responsible, while seeking to exclude the jury from considering the impact of other Trust Code

60.

provisions in recognition of the fact that this case is "about the commission of crimes" rather than conformity to the Trust Code.

{¶ 128} The state asserts that it used the Trust Code and the Rules of Professional Conduct only as circumstantial evidence to establish appellant's knowledge of appropriate trustee conduct. However, appellant's knowledge of appropriate trustee conduct under the Trust Code is not a concern in this case, where appellant is charged with criminal, not civil, wrongdoing. As stated above, this is a theft case. Even if appellant violated the Trust Code and the Rules of Professional Conduct, such violations do not constitute crimes. Moreover, our review of the record reveals that the state did not use the Trust Code and the Rules of Professional Conduct merely as circumstantial evidence of appellant's knowledge. Rather, the state cited appellant's alleged violations of the Trust Code as a standalone basis to find him guilty of the charged crimes.

{¶ 129} In light of the foregoing, we find that the evidence introduced and the testimony elicited at trial concerning the Trust Code and the Rules of Professional Conduct should have been excluded by the trial court because this evidence improperly invaded the province of the court to determine what law applied and to provide relevant instructions on that law. *State v. Clark*, 2d Dist. Clark No. 2013 CA 52, 2014-Ohio-855, ¶ 26 (finding that it would be erroneous to permit a witness to read a revised code statute to the jury or to testify regarding the witness's definition of a statutory term because doing so would invade the province of the trial court to instruct on the applicable law). This error was of particular import here, given the trial court's previous decision on the

state's motion in limine and request for jury instructions, in which the court rejected the state's argument that the beneficiary consent form and its related documents should be excluded because they were in violation of public policy under the Trust Code. The court based its decision on its determination that the Trust Code provisions referenced by the state were irrelevant in this criminal case, a sentiment with which we agree. Given the manner in which the state used this evidence, we further find that the introduction of this evidence confused the jury by inviting a criminal conviction premised upon the violation of civil laws.

{¶ 130} In light of the foregoing, we find appellant's second assignment of error well-taken.

{¶ 131} Having found that the Trust Code was irrelevant in this criminal case, we agree with the trial court's initial determination that the beneficiary consent form and its related documents were not inadmissible simply because they allegedly ran afoul of the Trust Code. Therefore, we find that the trial court properly denied the state's motion in limine. As a result, we find the state's second cross-assignment of error not well-taken.

{¶ 132} In his first assignment of error, appellant contends that the trial court erred in allowing the state to display Kinder's PowerPoint presentation for the jury during Kinder's testimony.

{¶ 133} At the outset, we note that the trial court allowed the presentation to be displayed during Kinder's testimony as a summary under Evid.R. 1006, which provides:

62.

The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at a reasonable time and place. The court may order that they be produced in court.

{¶ 134} As noted by the state in its brief, we distinguish between a summary under Evid.R. 1006 and a pedagogical device that is designed to "organize or aid the jury's examination of testimony or documents which are themselves admitted into evidence." *Gomez v. Great Lakes Steel Div., Natl. Steel Corp.*, 803 F.2d 250, 257 (6th Cir.1986), citing *United States v. Scales*, 594 F.2d 558, 563–64 (6th Cir.1979); J. Weinstein and M. Berger, *Weinstein's Evidence*, ¶ 1006[1]-[07] (1986). "While Evid.R. 1006 provides for the general admission of summaries into evidence, it does not provide for the admission of pedagogical devices, which 'are more akin to argument than evidence.'" *Kinn v. HCR ManorCare*, 2013-Ohio-4086, 998 N.E.2d 852, ¶ 79 (6th Dist.), citing *J. Weinstein and M. Berger, supra*, at ¶ 1006[07]. In drawing this distinction, we utilize the following language from the Sixth Circuit:

We understand the term "pedagogical device" to mean an illustrative aid such as information presented on a * * * chart * * * that (1) is used to summarize * * * evidence, such as documents, recordings, or trial testimony, that has been admitted in evidence; (2) is itself not admitted into

evidence; and (3) may reflect to some extent, through captions or other organizational devices or descriptions, the inferences and conclusions drawn from the underlying evidence by the summary's proponent.

*United States v. Bray*, 139 F.3d 1104, 1111–12 (6th Cir.1998).

{¶ 135} In this case, Kinder's PowerPoint presentation meets two of the three criteria of a pedagogical device under *Bray*. The presentation contains a summary of the state's evidence that was independently entered into evidence. At trial, Kinder explained that he created a summary of the evidence in the form of a Microsoft PowerPoint presentation in order to "make it easier to follow." According to Kinder, he prepared the presentation using "the evidence that was seized, through my interviews with different witnesses throughout this case, through information that I received via subpoena." Additionally, the PowerPoint presentation was not admitted into evidence and it was not included as an exhibit for the jury to review during deliberations, but was instead displayed in court during Kinder's testimony. Although Kinder's conclusions are not directly stated in the presentation, the language used therein, particularly in that portion of the presentation that attempts to summarize this case, reflects the state's view of the evidence. Consequently, we find that the PowerPoint presentation was a pedagogical device, not a summary under Evid.R. 1006. Thus, the trial court erred in allowing testimony regarding the PowerPoint presentation under Evid.R. 1006. *See Kinn*, *supra*, at ¶ 81.

64.

{¶ 136} The state argues, in part, that the trial court's allowance of the display of Kinder's PowerPoint presentation did not unduly prejudice appellant because Kinder was subject to cross-examination at trial. In *Kinn*, we held that the use of a pedagogical device consisting of a timeline was harmless error because the evidence upon which the timeline was based was independently admitted into evidence without objection and therefore had little or no effect. *Id*. at ¶ 82. Here, however, we find that the 65-slide PowerPoint presentation was more extensive in scope and impact than the timeline in *Kinn*. Indeed, Kinder's testimony was not merely *aided* by the presentation – his testimony was largely *based upon* the presentation. This is reflected in the fact that Kinder read directly from the PowerPoint during portions of his testimony. Moreover, the PowerPoint presentation contains a reference to the Trust Code provisions that we have already deemed inadmissible in our discussion of appellant's second assignment of error.

{¶ 137} Because we find that the trial court abused its discretion in allowing the state to utilize Kinder's PowerPoint presentation under Evid.R. 1006, we find appellant's first assignment of error well-taken.

### C. Prosecutorial Misconduct

{¶ 138} In appellant's fourth assignment of error, he argues that the state committed prosecutorial misconduct by opining as to his credibility during its closing argument, denigrating defense counsel, and misrepresenting the law and evidence throughout trial.

65.

{¶ 139} When reviewing a claim of prosecutorial misconduct, the relevant questions are (1) whether the prosecutor's remarks actually were improper, and (2) if they were, whether any of defendant's substantial rights were adversely affected. *State v. Lott*, 51 Ohio St.3d 160, 555 N.E.2d 293 (1990). "Reversal is warranted only if the prosecutorial misconduct 'permeates the entire atmosphere of the trial.'" *State v. Beebe*, 172 Ohio App.3d 512, 2007-Ohio-3746, 875 N.E.2d 985, ¶ 8 (4th Dist.), quoting *United States v. Warner*, 955 F.2d 441, 456 (6th Cir.1992). Thus, we will not reverse unless the prosecutor's misconduct deprives the defendant of a fair trial. *State v. Maurer*, 15 Ohio St.3d 239, 266, 473 N.E.2d 768 (1984).

{¶ 140} Appellant argues that the state committed prosecutorial misconduct in three ways. First, appellant contends that the state improperly opined as to his credibility when the prosecutor stated the following during closing argument:

> Analytically speaking, the case gets even easier for purposes of your deliberation because in order for you folks to find the defendant not guilty, you must conclude that the only person who you believed in this case is sitting at that table right there staring at me, the defendant. You would have to discount and discredit every other witness who testified in this case: Mr. Walker; his wife Jodie; Jim Hammer; the defendant's wife; the defendant's mother-in-law. In order to find him not guilty, you would have to discount all of the paper and the paper trail that was laid by Mr. Kinder. That's going to be a very difficult thing for any of you to do, let alone all of

66.

you to do. Using your reason and common sense, there is a very simple solution to this case, and that is you don't believe the defendant. You discredit him. You find him not worthy of belief and your reason and common sense takes over and says, you know what? It's his story against the world. I am not buying his story, however, I do believe Mr. Walker, his wife, Jodie, Mr. Hammer, even the defendant's wife and mother-in-law and Mr. Kinder, you believe the paper trail. Because you are the sole determiners of the credibility of the witnesses, that is your choice. Do you believe the defendant or do you believe everybody and everything else?

{¶ 141} According to appellant, the foregoing statement, particularly the portion where the prosecutor states "I am not buying his story," constitutes improper opining as to his credibility. Appellant's defense counsel did not object to the statement and, thus, any claim of misconduct is waived, absent plain error. *State v. Smith*, 3d Dist. Hardin No. 6–14–14, 2015-Ohio-2977, ¶ 63, citing *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 139 and *State v. Saleh*, 10th Dist. Franklin No. 07AP–431, 2009-Ohio-1542, ¶ 68.

{¶ 142} Crim.R. 52(B) defines plain errors as only those errors or defects that affect substantial rights. Under the plain error standard, we may reverse only if it is clear that appellant would not have been convicted in the absence of the allegedly improper conduct. *State v. Williams*, 79 Ohio St.3d 1, 12, 679 N.E.2d 646 (1997).

67.

{¶ 143} "The prosecution is normally entitled to a certain degree of latitude in its concluding remarks. * * * It is a prosecutor's duty in closing arguments to avoid efforts to obtain a conviction by going beyond the evidence which is before the jury." *State v. Smith*, 14 Ohio St.3d 13, 13-14 (1984), citing *State v. Woodards*, 6 Ohio St.2d 14, 26, 215 N.E.2d 568 (1966), *State v. Liberatore*, 69 Ohio St.2d 583, 589, 433 N.E.2d 561 (1982), and *United States v. Dorr*, 636 F.2d 117 (5th Cir.1981).

> [T]he prosecution must avoid insinuations and assertions which are calculated to mislead the jury. It is improper for an attorney to express his personal belief or opinion as to the credibility of a witness or as to the guilt of the accused. Moreover, * * * an attorney is not to allude to matters which will not be supported by admissible evidence, and "* * * [a] lawyer should not make unfair or derogatory personal reference to opposing counsel."

*Id.* at 14 (internal citations omitted), quoting the Code of Professional Responsibility. "The test regarding prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant." *Id.* (citation omitted).

{¶ 144} Upon a careful reading of the state's closing argument, it appears that appellant has taken the state's comments out of context. Rather than offering its own opinion as to the credibility of appellant, the state explained to the jury that it was the

68.

jury's sole responsibility to determine credibility. Indeed, the state concluded this section of its closing argument with an explicit statement to that effect.

{¶ 145} In essence, the state's comments were aimed at drawing a distinction between the version of events presented by its witnesses and the version of events presented by appellant, with an exhortation to the jury to consider the relative strength and believability of such evidence. "While it is improper for a prosecutor to state that the defendant is a liar or that he believes the defendant is lying, a prosecutor may suggest that the evidence demonstrates the defendant is lying, scheming, or has ulterior motives." *State v. Irwin*, 7th Dist. Columbiana No. 11–CO–6, 2012-Ohio-2704, ¶ 116, citing *State v. Kroger*, 12th Dist. Clermont No. CA99–05–050, 2000 WL 342130, *2 (Apr. 3, 2000). Because the state did not opine as to appellant's credibility, we find no merit to appellant's first argument.

{¶ 146} For his second argument, appellant contends that the state committed misconduct by insinuating that defense counsel was not telling the truth. Specifically, appellant takes issue with the following statement made by the state during its cross-examination of appellant:

> Don't you find it curious during the cross-examination of Mr.
> Walker, the question was never put to him if, at a later date, he showed up
> at your office you two joked about the note and just tore it up and threw it
> out – I take that back. You wrote the word void on it and then you tore it

69.

up and threw it out. Isn't it interesting that that question was never put to him?

{¶ 147} Appellant argues that this statement constituted impermissible insinuation that defense counsel was attempting to deceive the jury by not asking a relevant question. We think that is an unsupportable reading of the foregoing statement. The state did not call into question the integrity of defense counsel, either implicitly or explicitly. There is nothing improper about the state prodding appellant on weaknesses in his theory of the case. That is all that occurred here. Therefore, we find no merit to appellant's second argument.

{¶ 148} In his third argument, appellant asserts that the state committed misconduct in misstating the law when it referenced the Trust Code and the Rules of Professional Conduct at trial. In our analysis of appellant's second assignment of error above, we found that the trial court abused its discretion in allowing the references to the Trust Code and the Rules of Professional Conduct into evidence. Compounding that problem, the prosecutor focused on certain provisions in the Trust Code throughout trial, while ignoring other relevant provisions that arguably supported appellant's conduct. During closing arguments, the prosecutor directed the jury to consider appellant's alleged violation of the Trust Code and the Rules of Professional Conduct in determining whether appellant committed the crimes with which he was charged. Specifically, the prosecutor stated:

70.

Now, according to the law, [appellant] had duties to disclose information to Mr. Walker. He has duties to timely advise him of what was going on with the assets of the trust. He has a duty not to commingle, and we are going to look at a summary of the very law that the defendant researched as he was concocting this scheme. "The trustee shall administer the trust solely in the interest of the beneficiary." He even highlighted his own copy of a Trust Agreement that said he had to operate in accordance with his fiduciary duties. He recognized as far back as October 2014 that there were very high expectations for him as a trustee. He was told by the law that he must administer it as a prudent person would and that he shall consider the purposes, terms, distributional requirements, and other circumstances of the trust and that in satisfying that standard, the trustee shall exercise reasonable care, skill, and caution. He knew that under the law, he had to use his special skills or expertise. * * * But, perhaps the two most important ones are the last two, Revised Code section 5808.10(B), "A trustee shall keep trust property separate from the trustee's own property." Folks, I want you to read that again for yourself and then I have a question for you. Is there any ambiguity whatsoever in that law? Does it make exceptions, what if's, if you are on hard times? Absolutely not. And the defendant knew that before he started drafting documents, moving money, and ultimately converting it to his own use. Ultimately, Revised Code

section 5808.13 specifically provides that he shall promptly provide the beneficiary an account for the trust.

* * *

What do we know about other deceptive acts? Number one, Professional Conduct Rule 4.2 applies to all attorneys. Number two, the defendant knew that Mr. Hammer was representing Mr. Walker for purposes of the trust as early as October of '14. They shared office space in the same building. They texted each other frequently, e-mailed each other frequently, spoke with one another and worked out other matters. However, when you look at the e-mails from Mr. Hammer and Mr. Walker and Mr. Searfoss, you will not see one e-mail between the defendant and Mr. Hammer that says, I need to talk to you about the beneficiary consent, or please find a copy for your review of the beneficiary consent.

{¶ 149} Thereafter, the prosecutor instructed the jury not to consider appellant's reference to the consent provisions of the Trust Code, which ostensibly permit the conduct the state was decrying (commingling of trust assets), because this case was a criminal case, not a contract case.

{¶ 150} Upon due consideration of the record, we find the prosecutor's reference to the Trust Code and the Rules of Professional Conduct throughout the trial was extensive and improper. Given the likely impact this conduct had on the jury in inviting

72.

a criminal conviction based upon alleged violations of civil law, we find that the prosecutor's misconduct deprived appellant of a fair trial, and thus constitutes reversible error.

{¶ 151} In *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), the Supreme Court of the United States highlighted the sacred duty of United States Attorneys, the federal equivalent of the prosecutor in this case, when it stated:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor–indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Id*. at 88. The prosecutor's reliance upon the Trust Code and the Rules of Professional Conduct was calculated in order to obtain a criminal conviction, and is just the sort of improper method the state should refrain from employing in its pursuit of justice.

{¶ 152} Accordingly, appellant's fourth assignment of error is well-taken.

## III. Conclusion

{¶ 153} Having found that the trial court abused its discretion in allowing evidence pertaining to appellant's alleged violations of the Trust Code and the Rules of Professional Conduct, and in light of our determination that the state committed prosecutorial misconduct in this case, we reverse the judgment of the Wood County Court of Common Pleas and remand this matter to the trial court for a new trial.  Because we hold that appellant's money laundering convictions were not supported by sufficient evidence, appellant may not be retried on those charges, and they are hereby dismissed. Our resolution of appellant's assignments of error render the state's first and third cross-assignments of error moot.

{¶ 154} The state is hereby ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment reversed.<br>
and remanded.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.                     _____
                                                                    JUDGE
Christine E. Mayle, P.J.

Gene A. Zmuda, J.                          _____
CONCUR.                                                          JUDGE

                                                    _____
                                                                    JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.